UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| E.E.O.C., et al., | ) | Case No. 1:06CV2337 |
| | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| vs. | ) | |
| | ) | |
| Spitzer Management, Inc., et al., | ) | |
| | ) | |
| | ) | MEMORANDUM OF OPINION |
| Defendants. | ) | AND ORDER |

This matter is before the Court upon numerous motions for summary judgment by Defendants Spitzer Management, Inc., Spitzer Motor City, Inc., and Spitzer Autoworld Cleveland, LLC (collectively "Spitzer").  In addition, individual defendant Alan Spitzer ("Mr. Spitzer") has moved for summary judgment.  Each of the pending motions has been opposed. The Court now resolves each pending motion as detailed herein.

I.      Facts

While the docket is extensive in this matter, the underlying factual allegations are relatively straightforward.  On September 27, 2006, the EEOC filed its complaint against Spitzer. The initial complaint and the first amended complaint alleged that Spitzer had engaged in unlawful employment practices by creating a hostile work environment based upon national origin.  At that time, the amended complaint included Dean Okafor, David, Marek, and all those employees similarly situated at Spitzer.  Through discovery and complaints filed by intervenors, the allegations now include claims by Okafor, Marek, Hakim Nuriddin, Alawy Alawi, and Toufic Hamdan (now known as Nick Hamdan).  The complaints alleged that these various

1

Spitzer employees were referred to as:  jungle bunny, monkey, gorilla, slant eye, wax on wax off, Ali Baba, and angry Muslim.  The complaints allege that Marek, Alawi, and Hamdan were constructively discharged.  Moreover, the complaints allege that Spitzer retaliated against Okafor and Nuriddin based upon the charges they filed with the EEOC.

Spitzer has moved for summary judgment on each claim pending before the Court through numerous motions.  The EEOC, Nuriddin, and Okafor have each filed responses in opposition to the pending motions, and Spitzer has replied.  Mr. Spitzer has filed his own separate motion for summary judgment which has also been fully briefed.  The Court now resolves each of the pending motions.

## II.  Legal Standard for Summary Judgment

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R. Civ.P. 56(a).  The initial burden of showing the absence of any "genuine issues" belongs to the moving party.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citing former Fed.R. Civ.P. 56(c)).

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id*.  (quoting former Fed.R. Civ.P. 56(c)).  A fact is "material" only if its resolution will affect the outcome of the lawsuit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary burdens.  *Id*. at 252.  Moreover, the Court must view a summary judgment motion "in the light most favorable to the party opposing the motion."  *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Once the moving party has satisfied its burden of proof, the burden then shifts to the non-moving party. The non-moving party may not simply rely on its pleadings, but must "produce evidence that results in a conflict of material fact to be resolved by a jury." *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).  Moreover, Fed.R. Civ.P. 56(e) states as follows:

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:
>
> …
>
> (2) consider the fact undisputed for purposes of the motion; [or]
>
> (3) grant summary judgment if the motion and supporting materials--including the facts considered undisputed--show that the movant is entitled to it[.]

Accordingly, summary judgment analysis asks whether a trial is necessary and therefore is appropriate when there are no genuine issues of fact.  *Anderson,* 477 U.S. at 250.

### III. Legal Analysis

### A.  HOSTILE WORK ENVIRONMENT

The Sixth Circuit has previously explained the legal framework the Court must utilize in analyzing a hostile work environment claim as follows:

> Title VII offers employees protection from a "workplace [ ] permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment...." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, (1993) (internal citations and quotation marks omitted). To prevail on a hostile work environment claim, a plaintiff must show that his work environment was both objectively and subjectively hostile. "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment - an environment that a reasonable person would find hostile or abusive - is beyond Title VII's purview." *Id.* at 21-22; *see also Jackson v. Quanex*, 191 F.3d 647, 658 (6th Cir. 1999).
>
> To evaluate an alleged hostile work environment, we look at the totality of the circumstances. *Harris*, 510 U.S. at 23; *Bowman v. Shawnee State Univ.*, 220 F.3d

456, 463 (6th Cir. 2000). We consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23; *see also Williams v. GMC*, 187 F.3d 553, 560-62 (6th Cir. 1999). "[C]onduct must be extreme to amount to a change in the terms and conditions of employment...." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

Under Title VII, a plaintiff establishes a prima facie case of a hostile work environment based on race, religion, or national origin by demonstrating that (1) she was a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based on race, religion, or national origin; (4) the harassment unreasonably interfered with her work performance by creating an intimidating, hostile, or offensive work environment; and (5) the employer is liable. *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999); *see also Bourini v. Bridgestone/Firestone N. Am. Tire, L.L.C.*, 136 Fed.Appx. 747, 750 (6th Cir. 2005) (prima facie elements are the same for claims of racial and religious discrimination).

*Ejikeme v. Violet*, 307 Fed. Appx. 944, 948-49 (6th Cir. 2009). Section 1981, like Title VII, is not a "general civility code." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (discussing Title VII). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.' " *Id.* (internal citation omitted). Furthermore,

harassing comments and incidents that the plaintiff learned of second-hand may contribute to a hostile work environment and may be considered by the trier-of-fact. [*Robinson v. Coca-Cola Enterprises, Inc.*,] 2007 WL 2948869 *7 (citing *Quanex*, 191 F.3d at 661) ("[T]he fact that a plaintiff learns second-hand of a racially derogatory comment or joke by a fellow employee or supervisor can impact the work environment"); *Wanchik v. Great Lakes Health Plan, Inc.*, 6 Fed.Appx. 252, 262 (6th Cir. 2001) ("crediting evidence that plaintiff heard rumors about co-workers harassing other women in assessing whether the work environment was hostile.")

*Chancellor v. Coca-Cola Enterprises, Inc.*, 675 F.Supp.2d 771, 791 (S.D.Ohio 2009). "[E]vidence that may not have been explicitly accompanied by a racial or national origin slur may still contribute to a hostile work environment. *See Jackson v. Quanex Corp.*, 191 F.3d 647, 662 (6th Cir. 1999) ('[E]ven though a certain action may not have been specifically racial in

nature, it may contribute to the plaintiff's proof of a hostile work environment if it would not have occurred but for the fact [of the plaintiff's protected status].')." *Calderon v. Ford Motor Credit Co.*, 300 Fed. Appx. 362, 369 (6th Cir. 2008).

## 1. **Claims of Alawy Alawi**

Alawi claims that he was subjected to a hostile work environment based on his national origin while he worked at Spitzer Motor City. Alawi asserts that his Yemeni heritage subjected him to numerous comments from his general manager, James Dombrowski. The Court finds that the conduct alleged by Alawi does not meet the severe and pervasive standard necessary to support a claim for hostile work environment.

In support of his claim, Alawi alleges that Dombrowski called him to the sales tower, over the intercom, using the phrase "Ali Baba to the sales tower, Ali Baba to the sales tower, please." Doc. 122 at 30. Dombrowski does not deny referring to Alawi as Ali Baba. Doc. 111 at 45. While Ali Baba is a fictional character from ancient Arabic literature, the character has no direct links to Yemen. However, there is no question in the Court's view that the slang term was utilized based upon Alawi's national origin. The fact that Dombrowski may have been ignorant of its origin or ignorant of Middle Eastern geography does not somehow protect his conduct. Alawi also claims to have overheard Dombrowski refer to Okafor as "Nairobi man" and that he overhead Dombrowski refer to Marek as "wax on, wax off."

In support of his claim, Alawi relies heavily on *El-Hakem v. BJY Inc.*, 415 F.3d 1068 (9th Cir. 2005). The facts of *El-Hakem* were as follows:

> Although Young's conduct may not have been especially severe, there was unrefuted evidence of its frequency and pervasiveness. The jury heard testimony that Young continued to use the name "Manny" over El-Hakem's repeated objections. El-Hakem first objected to Young's use of "Manny" in a marketing meeting. Despite El-Hakem's objection, Young insisted on calling him "Manny" in a subsequent telephone conversation and e-mail. Approximately one month

later, El-Hakem proposed in an e-mail that Young use Hakem, his last name, if he found Mamdouh difficult to pronounce. Rather than call him Hakem, Young suggested in his reply e-mail that El-Hakem be called "Hank." El-Hakem objected again. Despite El-Hakem's continued objections, Young persisted in calling El-Hakem "Manny" once a week in the Monday marketing meeting for approximately two months, and in e-mails at least twice a month thereafter. The conduct continued for almost a year, from May, 1999 to April, 2000. Because these incidents were frequent and consistent rather than isolated, a reasonable juror could conclude that El-Hakem's work environment was hostile.

*Id.* at 1073-74.  As detailed above, the key to finding a hostile work environment in *El-Hakem* was the frequency and pervasiveness of the offending conduct.  The frequency and pervasiveness of the conduct herein is unknown.  In his deposition, Alawi indicated that "[a]t times he was, you know, he would make racial remarks towards certain salesmen such as Dean Okafor."  Alawi also indicated that Dombrowski would summon him to the sales tower with the "Ali Baba to the tower" comment.  While the EEOC's brief in opposition contends that a "reasonable jury could find Dombrowski's repeated use of the name Ali Baba" created a hostile work environment, its citation to the record again only references Alawi's vague account that he objected whenever the term was used.

The Court agrees with the analysis set forth in *El-Hakem* in many aspects.  Like the repeated use of an "American" name in *El-Hakem*, the repeated use of Ali Baba is not severe conduct.  It is no doubt offensive and demonstrative of ignorance, but it does approach the level of racial epithets that have been deemed severe.  Furthermore, the Court agrees that less severe language may still support a hostile work environment when used frequently and pervasively in the work place.  However, the record does not contain evidence of the frequency and pervasiveness of the use of this language.  Instead, the record only indicates that over a several month period, the term was used more than once -- whether it was used once a day, once a week,

or three times over five months is unknown.  Accordingly, the record contains insufficient evidence to generate a genuine issue of fact on Alawi's claim of a hostile work environment.

In reaching this conclusion, the Court has also considered Alawi's testimony that he overheard comments made to Okafor and Marek.  The Court also acknowledges that these overheard comments may contribute to a hostile work environment.  However, Alawi's testimony regarding these comments is similarly vague.  He cannot recount the frequency of these comments and could only recall in vague terms the specific words utilized by Dombrowski.  Accordingly, these terms similarly offer little support for Alawi's claim of a hostile work environment.

Alawi's claim of constructive discharge also fails.  To demonstrate constructive discharge, Alawi must show that 1) "the employer ... deliberately create[d] intolerable working conditions, as perceived by a reasonable person," and 2) the employer did so "with the intention of forcing the employee to quit...." *Moore v. KUKA Welding Sys.*, 171 F.3d 1073, 1080 (6th Cir. 1999).[1]  With regard to the first prong, this Court must consider

> the following factors relevant, singly or in combination: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

*Logan v. Denny's*, 259 F.3d 558, 569 (6th Cir. 2001) (quoting and adopting *Brown v. Bunge Corp.*, 207 F.3d 776, 782 (5th Cir. 2000)).  The Supreme Court has explained that constructive discharge requires a showing beyond that of a hostile working environment:  "Beyond that, we hold, to establish 'constructive discharge,' the plaintiff must make a further showing: She must

---

[1] As the EEOC properly argues, this "intent" prong has effectively been lessened by the holding in *Suders*.

show that the abusive working environment became so intolerable that her resignation qualified as a fitting response." *Pennsylvania State Police v. Suders*, 542 U.S. 129, 134 (2004).

Alawi cannot satisfy this test.  Alawi does not contend that his work place became so intolerable that he was required to resign.  Rather, he admits that he quit working because Dombrowski was rude to his wife.  Alawi's wife was waiting for her car to be serviced and Dombrowski allegedly approached her and told her to "get the fuck out of here."  Again, while this conduct was rude and offensive, it does not approach the level necessary to support a claim of constructive discharge.  Accordingly, Spitzer's motion for summary judgment on Alawi's claims is well taken.

### 2.  Claims of David Marek

Marek's claims are similar to those raised by Alawi and also arise from his employment at Spitzer Motor City.  Marek raises claims of hostile work environment based on his national origin (Korean) and constructive discharge.  The record evidence provided by Marek is more specific with regard to frequency and pervasiveness.  As such, the record does not support summary judgment on Marek's hostile work environment claim.

Marek was hired by Chris Johnson, Dombrowski's predecessor, as a sales associate on May 12, 2005.  Within a few months, Marek requested to be moved to an Auto Detailer/Porter position, asserting that the sales position was not a good fit for him.  His request was immediately fulfilled and he began work as an auto detailer.

Before analyzing the comments made to Marek, the Court must note that the comments made by Dombrowski that Marek was not aware of cannot directly contribute to this hostile work environment claim.  For example, Kevin Szatala testified that Dombrowski referred to Marek as "slant eye" and "rice rat."  There is no evidence before the Court that Marek was aware

8

of these comments.   However, as will be addressed below, the comments do serve to add context and meaning to the comments that were made *directly* to Marek.

Marek testified about comments that Dombrowski made to him as follows.  Dombrowski would approach him in the service area and state, "What's up, Mr. Chinaman?"  Doc. 117 at 40. Dombrowski would also state, "Chop chop, hurry up," and "wax on, wax off" to Marek.  Marek indicated that he was unaware of similar comments being made to other detailers.  Marek also testified that Dombrowski would make some form of these comments every time he came back to Marek's working area and that Dombrowski came back to his area on a daily basis.  Thus, the record indicates that Marek was subjected to these comments daily (five to six days a week) for numerous months.

Spitzer contends that Marek cannot satisfy three elements of his prima facie case:  1) that the harassment was based on Marek's national origin, 2) that he cannot demonstrate that the harassment was severe and pervasive, and 3) employer liability.  The Court will individually review each of these contentions.

Spitzer first asserts that the comments were not directed at Marek's national origin.  For example, Spitzer asserts that Marek is Korean, so the comment "What's up, Mr. Chinaman" could not be directed at his national origin.  Similarly, Spitzer contends that the "wax on wax off" comment was directed toward the actual duties that Marek had to perform as an auto detailer.  Spitzer's contentions here border on frivolous.

First, Marek and a co-worker, Kevin Szatala, both testified that Dombrowski mocked Marek's accent.  More specifically, Marek testified in his deposition that Dombrowski mocked his accent while utilizing the phrase "wax on wax off."  Therefore, any suggestion that such a phrase was solely used to direct Marek toward his work duties is unsupported by the record.

9

Second, Dombrowski's repeated references to "Chinaman" were clearly directed at Marek's Asian origin.[2]  Again, the fact that Dombrowski was ignorant of the particular country of Marek's origin does not provide a defense to his comments, nor does it support an argument that the comments were not based on national origin.  Furthermore, Dombrowski's "slant eye" and "rice rat" comments, while not made in Marek's presence, only serve to support a finding that Dombrowski's comments were premised upon Marek's Asian heritage.

There also remains a genuine issue of material fact surrounding whether the conduct was severe or pervasive.  In a case involving similar types of comments, the Ninth Circuit found no hostile work environment.  In so holding, the Court noted as follows:

> We think the actions of Manatt's co-workers generally fall into the "simple teasing" and "offhand comments" category of non-actionable discrimination. Manatt overheard jokes in which the phrase "China man" was used. And she overheard a reference to China and communism. But on *only a couple of occasions* did Manatt's co-workers or supervisor direct their racially insensitive "humor" at Manatt. One such instance occurred when Barbara Green and Vincent Correia ridiculed Manatt for mispronouncing "Lima." Another instance occurred when Green and Correia, upon seeing Manatt, pulled their eyes back with their fingers in an attempt to imitate or mock the appearance of Asians.

*Manatt v. Bank of America, NA*, 339 F.3d 792, 798 (9th Cir. 2003) (emphasis added).  Unlike the claim in *Manatt*, the facts herein indicate that Dombrowski's comments were nearly always directed at Marek – often with no other individual present.  Moreover, these were not isolated incidents that occurred every so often.  Marek testified that he endured the comments on a daily basis for months on end.

At this point, the Court notes that "the required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct." *Wanchik v. Great Lakes Health Plan, Inc.*, 6 Fed. Appx. 252, 263 (6th Cir. 2001) (quoting

---

[2] Similarly, Szatala testified that Dombrowski made comments to Marek like:  "You're not pulling a rickshaw, let's get the car going" and "When did you get out of the rice paddies?"  Doc. 120 at 52-54.

*Ellison v. Brady*, 924 F.2d 872, 878 (9th Cir. 1991)).  Thus, while Dombrowski's comments were not physically threatening or particularly severe, they were frequent and pervasive.  As such, a genuine issue of fact remains on this issue for a jury to decide.

Finally, Spitzer contends that Marek cannot demonstrate employer liability on his claim.  In this regard, Spitzer contends that Marek cannot demonstrate constructive discharge and also argues that even if constructive discharge could be shown, the *Faragher/Ellerth* defense would justify summary judgment.  The Court again reviews each contention individually.

With respect to constructive discharge, the Court finds that an issue of fact remains.  Marek was daily subjected to offensive comments related to his national origin.  For months, Marek endured the comments.  However, Marek quit following a confrontation with a co-worker, Walter Andrews.  As this confrontation was unrelated to Marek's national origin, Spitzer contends that his constructive discharge claim must fail.  The Court disagrees.

As noted above, in evaluating a constructive discharge claim, the Court must determine whether Marek's resignation was a "fitting response" to Dombrowski's harassment.  The facts herein compel submitting this issue to a jury.  Another employee, Greg Kramer, informed Marek after the Andrews' incident that he could quit or that Dombrowski would fire him.  Faced with appearing before his harasser for possible discipline or quitting, Marek's resignation was a fitting response.  The mere fact that he was capable of enduring the harassment up until that potential confrontation does not make the response any less reasonable.

Finally, Spitzer contends that Marek cannot demonstrate employer liability because Spitzer was never given the opportunity to remedy the harassment.  In that regard, *Faragher* and *Ellerth* are instructive.

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or

successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, see Fed. Rule Civ. Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. While proof that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense. And while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense.

*Faragher v. City of Boca Raton*, 525 U.S. 775, 807-08 (1998).  "No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment."  *Id.* at 808 (citing *Burlington Industries, Inc. v. Ellerth*, 525 U.S. 742, 762-63 (1998).  A constructive discharge case, like this one, may or may not involve an "official act" constituting a "tangible employment action" preceding the victim's resignation. *See Suders*, 542 U.S. 129.

The EEOC contends that Spitzer cannot avail itself of this defense because Dombrowski's official acts led to Marek's constructive discharge.

The Supreme Court, in resolving "the disagreement among the Circuits on whether a constructive discharge brought about by supervisor harassment ranks as a tangible employment action and therefore precludes assertion of the affirmative defense articulated in *Ellerth* and [*Faragher*]," has stated that a constructive discharge is not a "tangible employment action" in sexual harassment cases when the discharge is not precipitated by an official act of the company. *Penn. State Police v. Suders*, 542 U.S. 129, 140–41, 148–49 (2004) (holding the *Faragher/Ellerth* defense remains available to employers in constructive discharge cases "unless the plaintiff quit in reasonable response to an adverse action officially changing her employment status or situation"); *see also Plautz v. Potter*, 156 F. App'x 812, 819 (6th Cir. 2005) (stating that *Suders* held a "constructive discharge, while a potential liability-incurring employment action

for the employer, is not a 'tangible employment action' in sexual harassment cases").

*Parton v. Smoky Mountain Knife Works, Inc.*, 2011 WL 4036959, at *10 (E.D.Tenn. Sept. 12, 2011). With regard to the availability of this defense, the Court agrees with Spitzer that it is available.  Like the conduct discussed in *Suders*, Dombrowski's conduct "was exceedingly unofficial and involved no direct exercise of company authority; indeed, it was exactly the kind of wholly unauthorized conduct for which the affirmative defense was designed[.]"  *Suders*, 542 U.S. at 150 (quotation and citation omitted).

However, the record is clear that there remain genuine issues of material fact on both prongs of Spitzer's defense.  First, there exist issues of fact regarding whether Spitzer took reasonable care to prevent harassment.  Second, there exist issues of fact over whether Marek was unreasonable in declining to pursue those avenues of relief.

There is no dispute that Spitzer had some form of an anti-harassment policy.  That policy states in relevant part as follows:

> If you have been the victim of any type of discrimination or harassment of any kind by an associate or manager of this company including, but not limited to, discrimination or harassment based on your sex, age, race, religion, national origin, medical condition, disability, color, or sexual orientation or if you are aware that another associate or manager has been or is now the victim of discrimination or harassment you are to notify the general manager or business manager immediately.  If you prefer to notify someone outside of this company you may notify the office of Spitzer Management, Inc. by contacting Alan Spitzer, Anthony Giardini, Larry Ward or Neta Kizzer by telephone … or by mail[.]

Doc. 133-3 at 1.  Spitzer contends that the policy was readily available, provided to its employees, frequently updated, and posted throughout its dealerships.

Despite these contentions, summary judgment is inappropriate on this defense for myriad reasons.  First, Marek contends that he never received the above-quoted policy.  Second, the

record is replete with instances wherein the policy was not followed. As detailed above, Alawi was harassed by his general manager *over the loudspeaker* at the dealership. Other managers, however, did not report this harassment as required by the policy. Numerous other Spitzer employees and managers witnessed the harassment of many of the plaintiffs herein and none took steps to report it to Spitzer Management or to anyone for that matter. Moreover, as will be detailed below, Okafor in fact reported his harassment to Spitzer Management. That report did little or nothing to slow Dombrowski's harassment and ultimately Okafor's complaints led to him being sued by Spitzer. Accordingly, there exists a question of fact over whether Spitzer exercised reasonable care to prevent harassment. As such, summary judgment on Spitzer's *Farragher/Ellerth* affirmative defense is not justified.

**3. Claims of Toufic (Nick) Hamdan**

Unlike Alawi and Marek, Hamdan worked at Spitzer Autoworld Cleveland. However, similar to Marek and Alawi, Hamdan raises claims of hostile work environment and constructive discharge. The Court now reviews those contentions.

Hamdan was hired by Spitzer in January of 2005. He was born in Lebanon, and despite derogatory comments referring to him as an "angry Muslim," Hamdan is not Muslim. During the time frame at issue, Hamdan worked under general manager Mike Procaccini.

Hamdan ultimately left his employment with Spitzer in September of 2007. When asked why he left, Hamdan responded:

> Very simple. It was things that were being said about my origin, national origin or whatever, being called extremist, terrorist, uncivilized, Habibi, Habib. Those things. Write pretty much graffiti on the wall that were actually, you know, drawn out of a stick figure with a towel on his head, magic carpet sales with my name literally written on the board.
>
> …

> That stick figure right next to it would have my name next to it and right next to it I'd be the salesman selling magic carpets.

Doc. 126 at 33-34. Hamdan also claims he heard from another employee that Procaccini referred to him as an angry Muslim. When asked how often Procaccini made offensive comments, Hamdan responded "[t]hroughout the week, throughout the day, throughout the month[.]" Doc. 126 at 42. In addition, the record demonstrates that the general sales manager at that location, Rex Davidson, asked a young woman, in Hamdan's presence, whether she had ever ridden on a magic carpet. Doc. 126 at 44-45. Hamdan also testified that the graffiti remained on the sales board from March of 2007 through the time he quit in September. At one point, the graffiti depicted a stick figure with a turban and "the stick figure had a penis and then I – then the penis referred to [Hamdan] sucking on it." Doc. 126 at 56. Hamdan would routinely erase such graffiti, but it would always reappear. Hamdan also swore that upon seeing the graffiti, the managers, Davidson and Procaccini, laughed and took no disciplinary action against anyone. When Hamdan informed Procaccini that he did not like the way that Procaccini spoke about people of Middle Eastern decent, Procaccini merely responded "They're uncivilized." Doc. 126 at 47. Hamdan also recounted an event during which Davidson pretended to play a flute, while another Spitzer employer, Ron Baker, pretended to be snake – in essence, the two acted out a snake charmer's performance. On his final day of employment, Hamdan was signing insurance paperwork. Following signing one document, another Spitzer employee, Ron Baker, asked him "What is that, Habibi writing?" Doc. 126 at 43.

Initially, the Court agrees with Spitzer's argument that Hamdan cannot pursue a "perceived religion" claim. However, as Hamdan's national origin claims subsume all of the alleged derogatory comments, the effect of Spitzer's argument is minimal.

Spitzer also contends that Hamdan was not subjected to severe and pervasive harassment. The Court finds that the record creates a genuine issue of material fact surrounding this issue.  In a factually similar case, the Sixth Circuit explained as follows:

> It is, however, a question of fact whether a reasonable person would view the Detroit comments as creating a hostile work environment. Kevin G. told Hussain that he should dress as Osama bin Laden for Halloween. Additionally, Hussain states in his first affidavit that Wegert and other staff repeatedly called him Taliban and, in the second, says it was on a near daily basis. Just as world events diminished the harassing nature of Patrick's comment, here they increase the severity of these comments. Furthermore, the "Taliban" comments were made either repeatedly or on a near daily basis. This frequency would allow a reasonable person to conclude that the comments were intended to or did create a hostile work environment. Moreover, Hussain claims that he complained to Wegert about calling him Taliban, but he did not stop. Thus, there is at least a question of fact whether a reasonable person would conclude that Wegert's comments were intended to create a hostile work environment.

*Hussain v. Highgate Hotels, Inc.*, 126 Fed. Appx. 256, 268-69 (6th Cir. 2005).  Similar to the plaintiff in *Hussain*, Hamdan claimed that comments were made to or about him or Middle Easterners on nearly a daily basis.  Also similar to *Hussain*, Hamdan indicated his disgust for these comments and no corrective action was taken by anyone at Spitzer.  Other Courts have reached similar results:

> In this case, the basis for Alamjamili's hostile environment claim is (a) the fact that all other Iranian–American employees were also forced out by Berglund; (b) the fact that Khalil Pezeshcan was victimized by ethnically-charged comments and favoritism when he returned to Berglund in 2008; and (c) the pervasive comments and nicknames directed at Alamjamili from several co-workers, including one of his supervisors, Paul Reburn, and several of his colleagues: Don Musgrove, Johnny Flanagan, and others. (Alamjamili Dep. at 41.) Alamjamili claims that, especially after the events of September 11, 2001, several of his colleagues constantly referred to him as "Chemical Ali," "Camel Jockey," "Little Terrorist," or "Little Mexican," while others frequently queried where he had parked his camel. (Alamjamili Dep. at 153–163.)
>
> Although Berglund claims that these derisive epithets are insufficiently severe or pervasive, the court cannot concur. Several other courts have found that similar circumstances could support a hostile environment claim. In *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306 (4th Cir. 2008), for example, the Court held that the

16

plaintiff suffered severe and pervasive religious discrimination when several co-workers, including one supervisor, repeatedly called him "Taliban" and "towel head," questioned his allegiance to the United States, mocked his kufi and beard and observance of prayers, and made several anti-Muslim comments in the plaintiffs presence. *Id.* at 316–17. A similar result was reached in *Amirmokri v. Baltimore Gas & Elec. Co.*, 60 F.3d 1126 (4th Cir. 1995), where the Court held that the alleged harassment was sufficiently severe or pervasive when an Iranian plaintiff was called "names like 'the local terrorist,' a 'camel jockey' and 'the Emir of Waldorf'" on an almost daily basis. *Id.* at 1131. Likewise, the Court in *E.E.O.C. v. WC & M Enterprises, Inc.*, 496 F.3d 393 (5th Cir. 2007), held that the alleged harassment was severe and pervasive where the plaintiff's co-employees engaged in a long-term pattern of ridicule and repeatedly called plaintiff "Taliban" and "an Arab," told him to "go back where he came from," and stated that he was acting like a "Muslim extremist." *Id.* at 400–01.

Here, given that Alamjamili was allegedly subjected to these derogatory comments from numerous co-workers, including his direct supervisor, almost daily for a period of several years, the court can only conclude that he has adequately shown that the harassment he suffered was objectively severe and pervasive.

*Alamjamili v. Berglund Chevrolet, Inc.*, 2011 WL 1479101, at *13-14 (W.D.Va. Apr. 18, 2011). Like the plaintiffs in the above matters, Hamdan was subjected to nearly daily comments about his national origin. In addition to hearing the terms extremist, terrorist, and uncivilized on a routine basis, Hamdan was also subjected to mocking graffiti on a daily basis – graffiti that was both insulting to his national origin and sexually degrading. Upon witnessing this graffiti, Hamdan's supervisors laughed and made no effort to even erase it from view. With this record, a question of fact remains over whether the conduct was severe or pervasive.

Similar to the analysis performed above on Marek's claim of constructive discharge, a question of fact remains on Hamdan's claim of constructive discharge. Like Marek, Hamdan was subjected to daily derogatory remarks and disparaging graffiti. Like Marek, Hamdan endured this conduct for numerous months. Hamdan then finally resigned when Baker mocked

17

his handwriting by asking, "What is this, Habibi writing?"[3]  Moreover, Spitzer's attempts to isolate each instance are unavailing.  The fact that Baker made only a few stray remarks and the fact that Davidson made only a few stray remarks cannot be looked at in a vacuum.  The Court is required to examine the totality of the circumstances.  Reviewing all the conduct that was directed at Hamdan, there exists a genuine issue of fact over whether his resignation was a fitting response that was a foreseeable consequence of his employer's action.

Moreover, there similarly exists a genuine issue of material fact with respect to Spitzer's *Farragher/Ellerth* defense.  For the same reasons detailed above on Marek's claim, Spitzer is not entitled to summary judgment on its affirmative defenses.  The same failure of managers and employees to follow Spitzer's alleged anti-harassment policies existed at Spitzer AutoWorld and Motor City.  Accordingly, summary judgment on this affirmative defense is not supported by the record.

### 4. **Claims of Hakim Nuriddin**

The pleadings, briefing, and supporting materials in this matter consist of thousands of pages.  Despite those facts, it is unclear what precisely Nuriddin is claiming in his intervenor complaint.  Spitzer's motion for summary judgment and the opposition only serve to demonstrate that the parties themselves are also uncertain of the claims raised by Nuriddin.  Unlike the above plaintiffs, Nuriddin does not appear to raise a hostile work environment claim.  Instead, Nuriddin seems to assert a straightforward race discrimination claim.

It is well-established that the burden is on the plaintiff to establish a prima facie case of racial discrimination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252-254 (1981). A plaintiff can establish a prima facie case by showing that i) he

---

[3] Again here, Spitzer's claim that the use of this term is not offensive or insulting borders on frivolous.  Spitzer contends that since Habibi can be translated to "my love," the comment could not be offensive.  First, it is a virtual certainty that Baker did not know that translation.  Second, it is even more certain that the comment was not one made out of friendship, but instead a comment meant to mock Hamdan's national origin.

was a member of a protected class; ii) he was discharged; iii) he was qualified for the position; and iv) he was replaced by a person outside the protected class. S*ee McDonnell Douglas Corp.*, 411 U.S. at 802. A plaintiff can also establish a prima facie case of discrimination by showing, in addition to the first three elements, that a comparable non-protected person was treated better. *See Mitchell v. Toledo Hospital*, 964 F.2d 577, 582-83 (6th Cir. 1992). If a plaintiff claims race discrimination on the basis of such "disparate treatment", he must produce evidence which establishes: i) that he was a member of a protected class; and ii) that for the same or similar conduct he was treated differently from similarly situated, non-minority employees. *Id.*; *Davis v. Monsanto Chemical Co.*, 858 F.2d 347-348 (6th Cir. 1988), *cert. denied*, 490 U.S. 1110 (1989). A plaintiff always bears the ultimate burden of proving racial discrimination. *Burdine*, 450 U.S. at 253.

*Smith v. Reno*, 89 F.3d 835, at *2 (6th Cir. 1996) (table decision).

Setting aside the issue of whether Nuriddin's race claims are timely,[4] the Court finds that summary judgment is appropriate on these claims.  In his opposition brief, Nuriddin claims that he has demonstrated that he was treated differently than similarly situated, non-minority employees.  Moreover, Nuriddin details the incidents that he claims demonstrate this disparate treatment.  Nuriddin asserts as follows:

> White employees were permitted to park their cars in the garage, while Mr. Nuriddin was not.  Mr. Davidson was not fired, suspended or placed on probation when he screamed "mother f-cker" in Hakim Nuriddin's face; rather, Mr. Nuriddin was reprimanded for the incident.  Tracy Graham, a Caucasian who was known to have a temper and who often swore at managers and raised her voice at managers, was never disciplined for doing so.  Szatala p. 85.  She was not terminated when she told Larry Ward to "go s-ck a c-ck," or "kiss her -ss," or to "f-ck off."  Szatala p. 73.  Instead, Nuriddin was terminated when they argued.  The majority of this discipline was implemented with the active participation of Rex Davidson, who was known to call other non-white employees "niggers."

Doc. 187 at 50-51.  While Nuriddin's opposition brief spans 68 pages, there is no analysis tied to the above factual allegations.  There is no argument to demonstrate that any of the identified employees – the unnamed employees regarding parking, Graham, and Ward – were similarly situated to Nuriddin.  Accordingly, the record does not support a finding that Nuriddin's prima

---

[4] It appears to the Court that the EEOC timely initiated suit and that Nuriddin timely intervened. However, the Court need not resolve that issue to resolve Nuriddin's discrimination claims.

facie case has been satisfied.  As such, summary judgment on his discrimination claim is appropriate.

**5.** **Claims of Dean Okafor**

Okafor raises claims similar to Alawi, Marek, and Hamdan, asserting he was subjected to a hostile work environment.  Okafor claims that he was harassed based upon a combination of his Nigerian national origin and his African American race.  The Court finds that Spitzer's motion for summary judgment on this claim is not well taken.

Similar to Marek, Okafor was forced to endure nearly daily comments from Dombrowski.  Examples of Dombrowski's comments include:

- Asking Okafor, "What's for lunch, Dean, hyena?"

- Referring to Okafor as a "jungle bunny, tromping through the great outdoors"

- Referencing Africans as "being ancient and still [like] cavemen"

- Referring to Okafor as a monkey, a gorilla, "Nairobi man," and pygmy

- Asking Okafor when Africans "got out their grass skirt and started wearing clothes"

- Asking Okafor if he has "still got the spear hanging up on his mantel"

- Informing others that Okafor "doesn't eat nothing unless he kills it first"

- Speaking to Okafor about "chasing gazelles in the Homeland"

Okafor also testified that Dombrowski routinely mocked his accent.  Unlike several of the other plaintiffs, Okafor reported this misconduct to Spitzer Management.  However, Okafor only took this step when his reports of this conduct to other managers, namely Peyton Lycans, resulted in Okafor being told that Dombrowski was simply trying to befriend him.

Initially, Okafor spoke with Larry Ward at Spitzer Management.  Similar to Lycans, Ward informed Okafor that Dombrowski meant no harm.  Okafor pressed on with his reports of

the harassment and was eventually placed in contact with Anthony Giardini.  At that time, Giardini was Spitzer Management's chief operating officer and was transitioning to its General Counsel.  According to Okafor, Giardini informed Okafor that he was "thin skinned," "overreacting," and that if it were Giardini's decision, Okafor would have been fired.  Doc. 118 at 111-12.

Consistent with the Court's analysis of Marek's claim of a hostile work environment and Hamdan's similar claim, Okafor's claim presents genuine issues of material fact that must be presented to a jury.  Like Marek and Hamdan, Okafor was subjected to degrading comments on nearly a daily basis by a supervisor.  Despite his repeated protests *and* following the chain of command suggested by Spitzer's policies, Okafor was afforded no relief.  Accordingly, there exists a genuine issue of material fact with regard to whether Okafor was subjected to a hostile work environment.

Okafor also presented evidence that Dombrowski interfered with his sales, causing a loss in his income.  However, the Court need not resolve whether this was a tangible employment action.  Assuming there was no such action would allow Spitzer to raise its *Farragher/Ellerth* defense.  Based upon the Court's analysis above, this defense does not warrant summary judgment.  Accordingly, Okafor's hostile work environment claim survives.

B. **RETALIATION**

Okafor and Nuriddin also raise claims of retaliation.  The Sixth Circuit has explained the standard to apply in such a case as follows:

> A plaintiff must now prove that: (1) she engaged in activity protected by Title VII; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff, *or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor*; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment. *See Canitia v. Yellow Freight Sys., Inc.*, 903

F.2d 1064, 1066 (6th Cir.), *cert. denied*, 498 U.S. 984 (1990) (outlining previous standard for *prima facie* Title VII retaliatory harassment case). If and when a plaintiff has established a *prima facie case*, the burden of production of evidence shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for its actions. *Ibid.* (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). The plaintiff, who bears the burden of persuasion throughout the entire process, then must demonstrate "that the proffered reason was not the true reason for the employment decision." *Ibid.* (quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). The employer may also prove an affirmative defense to retaliatory harassment by a supervisor by demonstrating: "(a) that the employer exercised reasonable care to prevent and correct promptly any ... harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer to avoid harm otherwise." *Ellerth*, 118 S.Ct. at 2270.

*Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792-93 (6th Cir. 2000) (emphasis in original).

### 1. **Okafor's Claim of Retaliation**

There is no dispute that Okafor engaged in protected conduct and that Spitzer was aware of that conduct.  Spitzer, however, contends that the record is clear that Okafor cannot demonstrate an adverse employment action and a casual connection between that action and any protected activity.

Okafor identifies three adverse employment actions:  1) in October of 2006, Okafor was suspended for one day, 2) on March 31, 2007, Okafor was suspended for two days and told to avoid contact with customers, and 3) on July 10, 2008, Okafor was terminated.  Upon the Court's review of the record as detailed below, there is sufficient evidence for a jury to consider Okafor's claims that these constitute adverse employment actions.

With regard to the October of 2006 incident, the record reflects that the EEOC notified Spitzer on September 13, 2006 that Okafor's charge would be referred for possible litigation.  On September 27, 2006, the EEOC initiated this action.  Roughly one month later, Davidson counseled Okafor about the notice required to take time away from work.  Okafor asserts that the

exchange involved his need to take time off to care for his ailing mother and that Davidson responded: "I never heard of anybody come from overseas with a swollen knee like her." Doc. 118 at 58.  When Okafor inquired whether Davidson was mocking his mother, Davidson responded: "You know what, I'm not going to put up with fucking shit.  I know you're nothing but trouble."  Doc. 118 at 58.  The Court agrees that the direct inference to be drawn from Davidson's comments is that Davidson was aware of Okafor's EEOC complaint and subsequent litigation.  This inference is only further bolstered by Okafor's EEOC complaint about this incident and Spitzer's response to that charge.  In his complaint, Okafor specifically noted that during the exchange, he informed Davidson of his intent to file a formal complaint.  In its determination, the EEOC explained Spitzer's response to this allegation as follows:  "Further, Respondent [Spitzer] states that the Charging Party became belligerent and threatened to file EEOC charges against his manager.  According to Respondent, only after Charging Party made the aforementioned statement did the General Sales Manager [Davidson] send Charging Party home for the remainder of the day."  Doc. 174-2 at 1.  Accordingly, the record contains significant, direct evidence of a retaliatory animus.

The March 31, 2007 incident, however, stands on more tenuous ground.  In that regard, Okafor was suspended based upon customer complaints.  To support a causal connection, Okafor appears to rely on two factors.  First, he relies upon the temporal proximity between this punishment and *Nuriddin's* EEOC charge.  Second, Okafor contends that Spitzer believe that Nuriddin and Okafor were working together with regard to their EEOC complaints.  In essence, Okafor wants to stack inferences in order to find a retaliatory animus with regard to this incident. This stacking of inferences is not permissible.  Accordingly, with respect to this incident, Spitzer

23

has properly demonstrated that no causal connection exists between protected activity and this discipline.

Finally, the Court must examine Okafor's termination on July 10, 2008.  On June 26, 2008, the EEOC had filed suit against Spitzer, asserting claims on behalf of Okafor and Nuriddin.  Four days later, the Cleveland Plain Dealer published an article about the lawsuit.  On roughly that same day, July 1, 2008, Davidson summoned Okafor to his office and informed him that he "was no good, poisoned the sales force and had bad mouthed the dealership."  Doc. 173-9 at 1.   Nine days later, Okafor was terminated for an alleged violation of the sexual harassment policy.

Spitzer's response to all of these incidents seems to be grounded in its belief that it had legitimate reasons for all of Okafor's discipline.  With respect to the first incident, the fact that Davidson and Spitzer effectively admitted that Okafor was not sent home until he threatened to complain to the EEOC, any assertion by Spitzer that the discipline was legitimate rings hollow. With respect to Okafor's termination, the Court finds that Spitzer has presented sufficient evidence to meet its burden of demonstrating a legitimate reason for the termination.  Spitzer presented evidence that Okafor grabbed a female co-worker's arm and told her that she looked like a stewardess.  Spitzer also presented evidence that Okafor was less-than-cooperative with his supervisor after the incident, leading to his termination for sexual harassment.  Accordingly, the Court must review whether Okafor has demonstrated an issue of fact over whether that reason was pretextual.

The record supports submitting the matter of pretext to a jury.  The Sixth Circuit has noted that there are three methods for Okafor to meet his burden of demonstrating pretext.

> To make a submissible case on the credibility of his employer's explanation, the plaintiff is required to show by a preponderance of the evidence either 1) that the

proffered reasons had no basis in fact; 2) that the proffered reasons did not actually motivate his discharge; or 3) that they were insufficient to motivate discharge.

*Tinker v. Sears, Roebuck & Co.*, 127 F.3d 519, 522 (6th Cir. 1997) (citation and quotation omitted).

The EEOC has adequately demonstrated that the complaining parties, Michael Blackmur and Esther Kim, were close friends of the decision-maker, Davidson.  While these facts cast doubt on the veracity of the statements of Blackmur and Kim, the Court need not doubt their credibility in order to send this matter to a jury.  If the Spitzer witnesses are believed, Okafor grabbed Kim's arm and told her that she looked like a stewardess.  Blackmur reported the incident, and if he is believed, Okafor responded by calling Blackmur a "motherfucker" and "spoke Nigerian to Blackmur with an intimidating tone and threatening body language."  Doc. 137 at 9 (Spitzer motion for summary judgment).  Spitzer then ordered Okafor to apologize. When Okafor declined to apologize, he was terminated.

Based upon the totality of the evidence before this Court, there exist several questions of fact surrounding the issue of pretext.  First, assuming the truth of all of Spitzer's witnesses, there exists a question of whether Okafor's conduct justified his termination.  Based upon all the other reported conduct of Dombrowski and Procaccini that led to no discipline, it is highly unlikely that Okafor's conduct was severe enough to warrant termination.  In fact, the record contains evidence that Davidson screamed "motherfucker" at Nuriddin and received no discipline. Similarly, a close review of Spitzer's policy does not readily demonstrate how Okafor's conduct toward Kim was in violation of a sexual harassment policy.  As such, the Court finds sufficient issues of fact regarding pretext remain to submit this matter to a jury.

**2.  Nuriddin's Claim of Retaliation**

Nuriddin's retaliation claim rests upon his argument that he presented evidence of an "ongoing campaign of retaliation."  Doc. 187 at 46.  In so doing, however, Nuriddin makes little effort to demonstrate the adverse employment actions that support his claim and to demonstrate the causal connection between his protected activity and those employment actions.  It is clear from the record that many of the instances identified by Nuriddin are not adverse employment actions.  For example, Nuriddin was written up on March 19, 2007.  He, however, suffered no loss in wages or any other punishment for that write up.  As such, it was not an adverse employment action.

The Court does find that Nuriddin's reduction in hours would constitute an adverse employment action.  Additionally, Spitzer does not dispute that Nuriddin's termination constituted an adverse employment action.  In that respect, the record also demonstrates that Spitzer has proffered legitimate business reasons for both the reduction in hours and the termination -- namely, that the hours were reduced because the service department would no longer operate on Saturdays and that Nurridin was terminated for an angry encounter with his supervisor.  Accordingly, the Court must review whether there exists a question of fact regarding whether those reasons are pretextual.

With respect to Nuriddin's reduction in hours, the Court finds no issue of fact remains.  Spitzer offered evidence, through Nuriddin's own deposition, that his hours were altered because Spitzer's service department would be closed on Saturdays.  In the past, Nuriddin had taken Fridays off, so Spitzer offered Nuriddin the opportunity to work Fridays to continue his 40 hour work week.  Due to religious considerations, Nuriddin declined to work Fridays and therefore his weekly hours were reduced to 32.  Nuriddin's sole response to these facts appears to rely upon

the temporal proximity between his third charge with the EEOC and this reduction in hours. However, given the undisputed fact that Nuriddin could have maintained his schedule if he was willing to work a different day during the week, the temporal proximity standing alone is simply insufficient to create an issue of fact regarding pretext.

Nuriddin's termination, however, requires an independent analysis. Spitzer contends that Nuriddin was termination for an altercation with his supervisor, Tracy Graham. According to Spitzer, the two had a heated argument that was witnessed by another supervisor, Mitchell Mincy. Graham then later called Mincy stating that she was scared, shaking, almost in tears, and frightened of Nuriddin. The next day, Mincy terminated Nuriddin.

Nuriddin asserts that the reasons for his termination were pretextual and relies upon numerous inconsistencies to support his claim. First, in answers to interrogatories, Spitzer claimed that Davidson made the decision to terminate Nuriddin. Later, Spitzer asserted that solely Mincy made the decision. In addition, on August 14, 2008, Mincy filled out and signed an employee termination report and indicated that Nuriddin was fired for "insubordination with manager." Doc. 187-4. However, in discovery requests in this matter, Spitzer contends that Nuriddin was terminated for violating its anti-harassment policies. Nuriddin is correct that precedent suggests that these changing facts support submitting the matter to a jury.

In *Tinker*, the Sixth Circuit found an issue of fact on the issue of pretext and explained its reasoning as follows:

> Sears contends that Cassar made the decision to fire Tinker, and that his stated reason for the decision is the only relevant testimony. However, Fricker's statements indicate that he may have played a role in the decision to terminate Tinker's employment, and his reasoning for recommending this action is entirely different from Cassar's. The inconsistency of these statements by the different managers considering the Anthony Green incident, and Tinker's role in that incident, creates two important questions of material fact: who was actually responsible for the decision to fire Tinker, and what was the reason that caused

> that decision maker to decide that Tinker should be fired? These inconsistencies demonstrate that there is a genuine issue of material fact regarding Sears's proffered reason for Tinker's termination.

*Tinker*, 127 F.3d at 523.  Thus, the discrepancies noted above, standing alone, support submitting the issue of pretext to a jury.

The Court also believes that an issue of fact exists regarding whether Nuriddin's conduct was sufficient to warrant his termination.  Mincy personally observed the conduct.  At that time, he did not intervene, nor did he immediately discipline Nuriddin.  Furthermore, when meeting with Nuriddin the next morning, Mincy admitted that he "had no intentions of letting him go at the beginning of the meeting."  Doc. 114 at 30.  Mincy's assertions that he ultimately terminated Nuriddin because of Graham's expression that she remained fearful of him and could not work with him are also suspect.  Mincy was aware of Graham's feelings prior to the meeting and still began the meeting with no intention of firing Nuriddin.  Accordingly, there exist significant issues of fact surrounding whether Nuriddin's termination was pretextual.  This aspect of Nuriddin's retaliation claim must be submitted to a jury.

## C.  **SPITZER'S LAWSUIT**

Nuriddin and Okafor also raise a claim of abuse of process and a retaliation claim based upon a lawsuit that Spitzer filed against them following their termination.  The Court now examines those claims.

Under Ohio law, an abuse of process claim contains the following elements:  "(1) that a legal proceeding has been set in motion in proper form and with probable cause; (2) that the proceeding has been perverted to attempt to accomplish an ulterior purpose for which it was not designed; and (3) that direct damage has resulted from the wrongful use of process." *Yaklevich v. Kemp, Schaeffer & Rowe Co., L.P.A.*, 626 N.E.2d 115, paragraph one of syllabus (Ohio 1994).

Simply stated, "abuse of process occurs where someone attempts to achieve through use of the court that which the court is itself powerless to order."  *Robb v. Chagrin Lagoons Yacht Club, Inc.* 662 N.E.2d 9, 14 (Ohio 1996).

In its motion for summary judgment, Spitzer contends that it sought only to halt the slanderous and defamatory statements being made by Nuriddin and Okafor.  Accordingly, Spitzer contends that it never sought to achieve any remedy that was beyond the court's authority to issue.  At a minimum, a question of fact remains whether Spitzer sought to stop this activity or to completely silence Nuriddin and Okafor, a remedy far beyond the authority of the court.  In his deposition, Giardini stated that the lawsuit was filed to stop Nuriddin and Okafor from "telling members of the community and perhaps even customers that the management team there and the ownership of that dealership would discriminate against them, would treat them unfairly, or would do some harm to them in the future."  Doc. 110 at 99.  Furthermore, given that Spitzer could have vindicated its position through already pending litigation filed by the EEOC – that is, demonstrate the alleged falsity of these accusations, it lends support to a finding that the lawsuit against Nuriddin and Okafor personally was meant to silence their ongoing, protected speech.

For similar reasons, Nuriddin and Okafor's retaliation claim based upon the lawsuit must proceed to a jury trial.  As the Ohio Supreme Court has recognized that 1) the filing of a lawsuit may be an adverse action, and 2) that former employees are covered under Ohio's anti-retaliation laws, this claim is plausible on its face.  *See Green-Burger v. Temesi*, 879 N.E.2d 174 (Ohio 2007).  As there exists a question of fact over Spitzer's motivation for filing the suit, the Court finds that this aspect of the retaliation claims by Nuriddin and Okafor must be submitted to a jury.

D.  **ALAN SPITZER**

Alan Spitzer has filed his own motion for summary judgment, asserting that there is no basis for finding him individually liable.  Spitzer argues at length that there is no basis to pierce the corporate veil in this matter.  In response, Nuriddin and Okafor assert that they do not seek to pierce the corporate veil, rather they seek to hold Mr. Spitzer for his own discriminatory acts.  Specifically, Okafor and Nuriddin assert that Mr. Spitzer authorized the retaliatory lawsuit against them, and Nuriddin appears to asset that Mr. Spitzer had input into personnel decisions.

Initially, the Court notes that the record is clear Mr. Spitzer was not personally involved in the discipline or termination of any of the plaintiffs.  While he may have engaged in discussions about those individuals, there is no evidence of any kind to suggest that he provided direction or input into the discipline process of any plaintiff.  Accordingly, he cannot be found personally liable under that theory.

Mr. Spitzer's personal liability hinges upon the assertion that he authorized the lawsuit discussed above that was filed against Nuriddin and Okafor.  The support for this contention comes from Giardini deposition.  The following took place during that deposition:

Q   Who made the decision to file a lawsuit against Dean Okafor and Hakim Nuriddin?

A  My client.

Q  Which client?

A  Alan Spitzer.

Q  Alan Spitzer himself personally authorized the filing of that lawsuit?

A  He did as president of Spitzer Motor City, that's correct.

Q  Okay.  But you had a conversation directly with Alan Spitzer about bringing the lawsuit against Dean Okafor and Hakim Nuriddin and Al Spitzer himself authorized the filing of the lawsuit?

30

A  Of course.

Doc. 110 at 85-86.  Okafor and Nurridin contend that Ohio law allows for liability to extend to

Mr. Spitzer for his personal involvement in authorizing the lawsuit.

The Court agrees that Ohio law provides for this liability.  Furthermore, Mr. Spitzer

offered no reply brief to suggest any rationale that would absolve him from liability.  For

example, there is nothing in the record to suggest that a Board of Director's decision or some

other form of authorization was required to initiate the lawsuit.  As such, as the record stands,

Mr. Spitzer personally authorized the lawsuit.  As the Court noted above, there remain questions

of fact surrounding the motivation for filing that lawsuit.  Accordingly, Mr. Spitzer's motion for

summary judgment must be denied.

## IV. Conclusion

Defendants' motions for summary judgment are resolved as detailed herein. To the extent

that Defendants' also sought summary judgment on solely the issue of punitive damages, that

motion is DENIED.   A jury will ultimately determine the proper remedy in this matter, and

Spitzer is of course free to revisit this issue during Rule 50 motion practice during trial.

IT IS SO ORDERED.


DATED: March 30, 2012                       __/s/ John  R.  Adams_____
                                            JOHN R. ADAMS
                                            UNITED STATES DISTRICT JUDGE