UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| Equal Employment Opportunity Commission, et al., | CASE NOS.  1:06CV2337 (Lead Case) 1:08CV1326, 1:08CV1542, 1:09CV255 |
| Plaintiffs, | |
| vs. | JUDGE JOHN R. ADAMS |
| Spitzer Management, Inc., et al., | **ORDER** |
| Defendants. | (Resolves Docs. 320, 326, 327, 331) |

Pending before the Court are numerous motions filed by the parties following the declaration of a mistrial in this matter on January 23, 2013.  Plaintiffs EEOC, Nurridin, and Okafor have moved for default judgment (Doc. 320) and sought attorney fees and costs (Docs. 326, 327).  Defendants have sought leave (Doc. 331) to file instanter a supplement to their opposition to the motion for fees.  The motion for leave is GRANTED.  The supplemental opposition will be considered herein.

The motion for default judgment is DENIED.  The motions for attorney fees and costs are GRANTED as detailed herein.

**I.  Facts**

The initial complaint in this matter was filed on September 27, 2006.  As discovery progressed, Plaintiff intervenors Nurridin and Okafor sought and received permission to file their own complaints which were consolidated with the complaint filed by the EEOC.  The matter moved forward slowly with discovery before the previously-assigned district judge and motion practice eventually began in late 2010.  On March 30, 2012, the Court resolved the pending motions for summary judgment, leaving numerous claims to be decided at trial.  On January 14,

2013, a jury was empanelled in this matter.  Opening statements and witness testimony then began on January 15, 2013.

After roughly one week of witness testimony, an issue regarding Defendants' exhibits was raised by Plaintiffs.  Specifically, Plaintiffs indicated that internal fax headers had been removed from certain witness statements that Defendants were using during cross-examination.  Plaintiffs asserted that these fax headers were material to the exhibits because the exhibits were witness statements that had no other information on them that would suggest the time period during which they were produced.  When questioned about the omission of these headers, Defendants' counsel had no explanation for the Court.  Attorneys Griffith and Cook and party representative Giardini[1] could only speculate as to how Defendants' exhibits came to be different than those provided to Plaintiffs during discovery.  After a night to contemplate the matter, Defendants' counsel indicated that the fax headers were removed as a part of "cleaning" the exhibits for trial purposes.  Counsel was specific that this was a common practice and had been performed on all of the exhibits.  Counsel also indicated that they could not provide this simple answer to the Court the prior day, despite numerous opportunities, because the Court's inquiry had made them nervous.

The inability of counsel to provide such an answer gave the Court pause and caused it to consider a method by which Plaintiffs could be ensured that no other exhibits had been altered – whether inadvertently or not.  As a result, the Court ordered that Defendants immediately produce the originals of *every* document that had been produced during discovery.  The Court found that, at a minimum, this disclosure was necessary to place to rest any future issues

---

[1] It is important to note that from 2006 until March of 2010, Giardini was counsel of record for the Spitzer defendants.  Furthermore, for at least those five years, Giardini was an assistant secretary and Director for Spitzer Management, Inc.

2

regarding the alteration of exhibits, purposeful or not.  However, far from resolving the issues that arose from altering the proffered exhibits, the order to produce originals created much larger, more serious issues for the Court to resolve.

Upon returning to court, defense counsel described the "herculean" efforts that were undertaken to find the original documents.  These efforts entailed reviewing documents at numerous Spitzer car dealerships across the area.  Despite ongoing litigation, Defendants had apparently made no efforts to segregate the items that were properly responsive to discovery.  This fact could also conceivably explain why Defendants' in-trial production resulted in numerous documents being produced that had **never** been previously produced in more than six years of litigation.  Of course, simple neglect would be the kindest interpretation available for Defendants' conduct.  In reality, in less than 24 hours following the Court's demand to produce documents, Defendants were suddenly able to locate and produce documents directly responsive to years-old discovery requests.  The Court must now determine what sanction, if any, in addition to a mistrial, is appropriate in this matter.

**II. Legal Standard**

Pursuant to Federal Rule of Civil Procedure 37(b)(2)(A), "[a] district judge holds a variety of [discovery] sanctions in his arsenal, the most severe of which is the power to issue a default judgment." *Grange Mut. Cas. Co. v. Mack*, 270 F. App'x 372, 376 (6th Cir. 2008); *see also Bass v. Jostens, Inc.*, 71 F.3d 237, 241 (6th Cir. 1995) ("a district court may sanction parties who fail to comply with its orders in a variety of ways, including dismissal of the lawsuit."); *Regional Refuse Sys., Inc. v. Inland Reclamation Co.*, 842 F.2d 150, 154 (6th Cir. 1988) ("Dismissal of an action for failure to cooperate in discovery is a sanction of last resort.").

> Sanctions that the court may impose for discovery violations include—in ascending order of harshness—an order directing the noncompliant party to

3

> provide further discovery; shifting of costs, including attorneys' fees, incurred by the other parties in connection with the discovery violation; imposing fines payable to the court on the culpable party or its attorneys; an instruction informing the jury of the discovery breach; an order precluding the noncompliant party from using particular pieces of evidence that were withheld during discovery in connection with motions or at trial; an order establishing particular facts, issues, claims, or defenses related to the discovery abuse against the noncompliant party; or the entry of a default judgment, dismissal, or declaration of a mistrial ("terminating sanctions").

*RFMAS Inc. v. So*, 271 F.R.D. 13, 22 (S.D.N.Y. 2010) (footnotes omitted).

Additionally, a court may sanction an attorney under § 1927 for conduct that "so multiplies the proceedings in any case unreasonably and vexatiously." 28 U.S.C. § 1927; *see also Rentz v. Dynasty Apparel Indus.*, 556 F.3d 389, 395–96 (6th Cir. 2009). Section 1927 sanctions are appropriate when counsel "objectively falls short of the obligations owed by a member of the bar to the court and which, as a result, causes additional expense to the opposing party. The purpose is to deter dilatory litigation practices and to punish aggressive tactics that far exceed zealous advocacy." *Red Carpet Studios Div. of Source Advantage, Ltd.*, 465 F.3d at 646 (citation and internal quotation marks omitted). An award of fees under § 1927 requires a showing of more than negligence or incompetence but less than subjective bad faith. *Hall*, 595 F.3d at 276; *see also Dixon v. Clem*, 492 F.3d 665, 679 (6th Cir. 2007).

Furthermore, the Sixth Circuit has articulated four factors for this Court to consider in determining whether the most severe sanction, default judgment or dismissal, is appropriate: "'(1) whether the party's failure is due to willfulness, bad faith, or fault; (2) whether the adversary was prejudiced by the dismissed party's conduct; (3) whether the dismissed party was warned that failure to cooperate could lead to dismissal; and (4) whether less drastic sanctions were imposed or considered before dismissal was ordered." *Universal Health Group v. Allstate Ins. Co.*, 703 F.3d 953, 956 (6th Cir. 2013) (quoting *United States v. Reyes*, 307 F.3d 451, 458

4

(6th Cir. 2002)). "Although no one factor is dispositive, dismissal is proper if the record demonstrates delay or contumacious conduct." *id.*, i.e., conduct that is "'perverse in resisting authority' and 'stubbornly disobedient.'" *Schafer v. City of Defiance Police Dept.*, 529 F.3d 731, 737 (6th Cir. 2008) (quoting Webster's Third New International Dictionary 497 (1986)).

**III. Analysis**

In order to determine the proper sanction in this matter, the Court must analyze the evidence that was withheld. The Court must also take into account Defendants' explanation for its failure to produce, along with any prejudice stemming from the non-production.

1. **Blackmur personnel file**

First, Defendants failed to produce the personnel file of former employee, Michael Blackmur. Defendants contend that little to no prejudice stemmed from this non-production. In contrast, Plaintiffs contend that they were deprived of the ability to properly prepare for the deposition and trial testimony of Blackmur without this file. In support, Plaintiffs highlight that Blackmur testified that he left Spitzer in the winter of 2009 and that his departure was amicable. In contrast, Blackmur's personnel file indicates that his employment ended roughly nine days after his involvement in Plaintiff Okafor's termination. The personnel file notes that Blackmur was coded as "ineligible for rehire." Despite this notation, Blackmur was later re-hired by Spitzer. As Plaintiffs would argue, this re-hiring took place during the same timeframe that Plaintiffs Nurridin and Okafor sought to intervene in this matter.

Based upon the above, it is clear that Plaintiffs would argue that Blackmur's testimony was biased, as he was rehired by Spitzer *during* the litigation, despite notes in his personnel file that indicated that he would not be eligible to be rehired. In any event, it is undisputed that Plaintiffs were unable to explore this line of questioning during deposition or trial because of

5

Defendants' failure to timely produce the file during discovery. Furthermore, to date, there has been no reasonable explanation for the failure to produce this file. While Defendants have alleged that they made extraordinary efforts once the Court ordered that all originals be produced, their efforts appear to be nothing more than reviewing the records at each of the Spitzer dealerships. These "extraordinary" efforts are precisely what were required from Spitzer from the very first discovery request made in this matter.

2. **Kim personnel file**

Defendants also failed to produce the entire personnel file for Esther Kim. The Kim file indicated there had been a recommendation that Spitzer have a follow-up discussion with Kim about recognizing and reporting sexual harassment – that recommendation coming roughly nine months prior to Kim's interaction with Plaintiff Okafor that led her to alleged harassment. For unknown reasons, this document was not in Kim's file when it was produced during discovery. As a result, Plaintiffs were precluded from engaging in discovery to determine whether any follow-up was done with Kim, who conducted that follow up, and what was discussed. However, the Court has had the opportunity to hear evidence regarding the alleged "sexual harassment" incident, and the assertion that the conduct was indeed sexual harassment is weak, at best. Effectively, on one isolated occasion, Okafor brushed Kim's arm while stating that he thought she was dressed like a uniformed stewardess or flight attendant. Based upon those facts, the jump to Kim alleging sexual harassment certainly leaves open the question of what prior advice Spitzer had given her about spotting and reporting such harassment. Once again, however, Plaintiffs were deprived of the opportunity to even engage in that line of questioning due to Spitzer's failure to produce this document.

6

3. **Bury file**

Defendants also failed to produce a personnel file that has been referred to as the Bury file. Defendants contend that this file was compiled after Okafor's termination in response to his claim for unemployment. In response, Plaintiffs assert that at least one Spitzer employee, Rex Davidson, testified that Spitzer was "keeping a file" on Okafor. Plaintiffs contend that the file maintained by employee Thomas Bury was just that file, noting that there were numerous documents in the file that contained disparaging remarks about Okafor.

Two things are certain regarding the Bury file – it contains highly relevant information and Spitzer has offered no reasonable explanation for failing to produce it during discovery. Assuming that Spitzer's version of the file is true, the information compiled to defend against Okafor's claim of unemployment would certainly be directly tied to his work performance and any related complaints. All such information would be highly relevant to Okafor's claims in this litigation.

4. **Nuriddin's file**

During trial, Plaintiffs also received for the first time documents that were apparently within Plaintiff Nuriddin's personnel file. While Nuriddin's file was provided during discovery, when the Court ordered that the entire original file be produced, numerous, previously-unseen documents were produced. For example, there was an employee verification form noting that Nuriddin was a "very good employee" and reliable. Another information request in May of 2002 indicated that Nuriddin was an "excellent" employee. Spitzer once again seeks to downplay the value of this evidence by indicating that these were simple responses to outside requests for information about Nuriddin's employment. In a vacuum this may be true. However, during trial, Spitzer took great pains to demonstrate to the jury that Spitzer had every right to question

Nuriddin's conduct and truthfulness based on alleged prior bad acts in the workplace. At that point in time, there is little question that had these documents been produced *during discovery*, Spitzer would not have pursued this line of questioning **or** these documents would have been utilized to rehabilitate Nuriddin in the eyes of the jury. In any event, Spitzer's failure to produce them once again deprived Plaintiffs of the ability to investigate and utilize these documents during pretrial motion practice and trial.

5. **Pena notes**

During May of 2006, Attorney Pena was performing work in Giardini's law firm and was assigned to investigate Okafor's complaint. Pena admits that she took notes of a conversation she had with Dombrowski and took notes of interviews she performed with 12 other Spitzer employees. Pena claims that she later converted her handwritten notes to typed statements. Those typed statements were later signed by the employees. Pena also asserts that "the written statements which [she] prepared accurately and to the best of [her] recollection at the time completely reflected the statements given to [her] by those employees[.]" It is undisputed that Pena's handwritten notes were not provided before trial. Spitzer, however, contends that no prejudice stems from this non-production because the undated, typed statements were provided. It is these undated statements that Spitzer altered by removing fax headers and caused the initial concerns for the Court.

As Plaintiff's have highlighted, the **typed** statement from employee Wayne Andrews reads: "I have worked with Jim Dombrowski for two years and have never heard a racist comment from him. Jim usually makes the other employees tone down their comments." In contrast, Pena's notes indicate that Andrews witnessed Dombrowski page Okafor with a "Nairobi accent." In her notes, Pena commented as follows on that statement: "BAD for US."

8

At a minimum, Andrews' typed statement is not all inclusive of his verbal interview.[2] Instead, it is apparent that only the most favorable points of Andrews' statement were included in the typed statement that was ultimately provided. Once again, without these notes, Plaintiffs could not effectively engage in discovery related to Andrews and Pena. Moreover, Spitzer again has failed to offer any *reasonable* explanation for its failure to produce the notes.

6. **Giardini's notes**

From the Court's review, the most glaring failure to disclose documents involves the notes taken by General Counsel and at one time trial counsel for Spitzer, Anthony Giardini.[3] Time and again throughout discovery in this matter, Giardini and others indicated that discrimination complaints were investigated and that Giardini had taken notes during many of the interviews in these investigations. However, when the notes were requested over and over and over again during discovery, none were produced. For that matter, when Plaintiffs' counsel requested them during Giardini's deposition, the response from Giardini and counsel bordered on both mockery and condescension.

> In that respect, Plaintiffs' counsel inquired during Giardini's deposition as follows:
>
> Q. And have you brought with you any documents that were created by you or maintained by you as part of that investigation?
>
> A. I haven't brought any documents with me beyond what I had previously turned over to either the EEOC or to Chris, to Mr. Cook.
>
> Q. Are there documents responsive to number one of the duces tecum that are going to be provided today as part of the duces tecum?

---

[2] The Court acknowledges that the Andrews' notes do contain the seemingly-in-conflict statement that Andrews had never heard Dombrowski make a racist comment.
[3] In addition to general counsel, assistant secretary, and Director, Alan Spitzer testified that Giardini at one point in time was the Chief Operating Officer for Spitzer Management.

>Mr. Cook: No. And I can explain that a little bit. First of all, I think that the documents have already been provided. I don't believe that there are any documents that have not been provided to [Plaintiffs] throughout discovery.

Giardini then affirmed that he believed that all documents that were responsive to the discovery requests had been provided. Giardini was then questioned about whether he took notes during his investigation.

>Q. Did you personally create any notes as part of your investigation of any of the allegations involved in this case?
>
>A. I'm sure I did. I'm sure I made notes.
>
>Q. And what did you do with those notes?
>
>A. I would have put them in the file at Spitzer Management. I know I didn't take them with me, and I don't have them in my office.
>
>Q. And is it your understanding that those notes have been produced?
>
>A. If they exist, they would have been produced, correct.

Attorney Scully was present throughout this line of questioning during the deposition.

Later on in his deposition, Giardini became combative when asked about a conversation that he had with employee Gilbert Tirado. At that juncture of the deposition, Giardini concedes that he took notes of a conversation with Tirado, a conversation in which Tirado allegedly told Giardini that Okafor and Nuriddin were complaining to other employees about discrimination. When asked why those notes were not produced, Giardini responded, "Because you didn't ask for them." Given the nature of the retaliation claims raised by Plaintiffs and their discovery requests, there is no reasonable, conceivable method for reaching the conclusion that the documents had not been requested. Instead, such an answer merely foreshadowed that Giardini and Spitzer would produce only those documents they wanted to produce and only at a time that was convenient for them.

In May of 2010, Attorney Cook responded to still another request that the notes be produced as follows:

> Regarding your Request For Production No. 7, I believe Mr. Giardini thoroughly addressed the issue of his notes and correspondence in his deposition. I believe his testimony was that he did not retain these documents. Again, we cannot produce that which we do not have. I can represent to you that I now have the entire file regarding this case and that no such "notes" exist.

Attorney Cook's response that "no such 'notes' exist" is rather curious given Giardini's response that he was certain that he had taken notes and was simply unsure of their current location. Furthermore, given Attorney Scully's admission, discussed below, it is clear that Attorney Cook did not have the "entire" file at the time of his response – either by virtue of failing to properly inquire or worse.

In a later deposition of Giardini, the issue of his notes was yet again front and center. When asked whether he took notes regarding a statement from Ollie Wells, he responded, "I'm sure I probably did. I don't know that I have them anymore." That statement in and of itself is cause for concern as any such notes would have been subject to a litigation hold at the time of their creation. When asked whether the notes still existed, Giardini stated "They may exist, but I don't know where they're at." Once again, Attorney Scully sat through this entire line of questioning.

Near the end of this second deposition, Attorney Cook raised issues with the time being spent on the deposition. When counsel for the EEOC indicated that she had many questions left to ask, Attorney Cook suggested she should have interrupted co-counsel to preserve more time. At that time, EEOC counsel stated "I have not had an opportunity to review the 600 documents that were delivered yesterday." Rather than being apologetic for such a tardy production of documents, Attorney Scully noted "You'd still be in the same boat if you had." Giardini

11

followed with the comment:  "A deeper boat."  In hindsight, it is not surprising that Giardini and Scully were so confident that the new documents were not damaging to their defense.  As has become clear, any damaging documents were simply withheld.

Perhaps what is most egregious about the failure to produce the handwritten notes is the admission by counsel, William Scully, that the notes had been in his possession throughout all of the document requests.  According to Scully, he received documents from Giardini on September 5, 2008, copied the documents, and returned the originals to Giardini on September 17, 2008. Scully also admits that he attended both of Giardini's depositions, even speaking as quoted above about the late production of documents. He overheard question after question posed to Giardini about the whereabouts of his notes.  He heard Giardini state that if the notes existed, they would have been in a file at Spitzer Management, the entity Scully was representing. His defense to non-disclosure is as follows:  "I had no involvement in the written discovery process. I did not identify or produce any documents pursuant to requests of the plaintiffs.  I had no involvement in any discovery disputes."  It is entirely unclear to the Court how this somehow absolves Scully from his obligations as a lawyer.  He admittedly entered his appearance in this matter on behalf of Spitzer Management.  He received documents from a witness in the matter. He retained those documents.  The fact that he or his co-counsel in the matter chose to have one set of attorneys respond to discovery did not somehow eliminate his ethical responsibility to review his file and provide responsive documents. Effectively, Scully's affidavit establishes that he had responsive documents in his possession at every stage they were requested, but he simply failed to ever review those documents to determine if they should be provided.[4]

---

[4] The Court would note that Attorney Scully was present every day during trial and apparently still never reviewed his files until the Court ordered full disclosure of all documents.  At that point, he apparently "remembered" receiving files from Giardini.

12

Scully's affidavit also establishes another troubling fact. According to his affidavit, Scully returned the originals of the documents he received from Giardini to Giardini on September 17, 2008. Even after the Court's order to produce **all** documents, the originals of these documents have never surfaced. This is problematic for several reasons. First and foremost, Defendants have relied heavily on the *Farragher-Ellerth* defense in this matter, alleging that they had a proper system in place to combat harassment and discrimination. The heart of that defense would necessarily center around *how* Spitzer responded to and investigated complaints of harassment and discrimination. Yet, somehow, the handwritten notes of general counsel disappeared, well after this litigation had commenced.

Even in opposition to the current motion for default judgment, Giardini continues to state that he does "not know what happened" to the notes of his meeting with Okafor. He, however, is quick to point out that any box that was returned to him from Scully would have been immediately turned over to Attorney Cook. In other words, Giardini has sworn that he turned his notes over to Attorney Cook **and** Attorney Scully has sworn that he has had possession of a copy of those notes for years. Yet, the notes were not produced before trial, despite repeated requests by counsel and despite their high evidentiary value to the entirety of the proceedings.

Like many of the documents described above, it is difficult to quantify the prejudice to Plaintiffs from the failure to disclose these notes. The notes include alleged comments of a discriminatory nature that were directed at Okafor, but not otherwise documented in this litigation. But perhaps more central to the claims herein, they contain statements to "pull sales record[s]" for Okafor and to "Document sales of Dean."

As with all of the documents that Defendants failed to produce, they insist that these notes carry minimal value to Plaintiffs' claim. They contend that all sales were tracked for all

13

employees. Again, however, they attempt to strip away all context when making such an assertion. Okafor has consistently maintained that Spitzer retaliated against him for making continuous complaints about harassment and discrimination. While Spitzer would like one to believe that the notes of its counsel are meaningless, a jury could quite easily conclude that they are evidence of such retaliation. It is not a far leap to conclude that the notes instruct employees to more closely scrutinize Okafor *because* of his complaints. For that matter, the Court would note that if it was the common, across-the-board practice to monitor the sales of all employees, there would be no reason for general counsel to make a note to ensure that such monitoring was being done on Okafor.

Furthermore, while the Court will reserve deciding the issue of an adverse instruction until re-trial in this matter, it is certainly possible that given the failure of the originals of these documents to be retained, a jury may be instructed to draw an adverse inference. Such an inference, coupled with the comments in these notes, could strongly support a claim of retaliation.

Additionally, Spitzer again ignores that Giardini's notes do not solely affect Okafor's claims. Spitzer's primary defense relies upon a finding that it had an effective system in place to report and combat discrimination. If a jury finds that the primary cog in that system, Giardini, is prone to retaliate against those making complaints, the heart of Spitzer's defense is suddenly non-existent. Accordingly, withholding these notes resulted in significant prejudice to **all** remaining Plaintiffs.

Furthermore, any evidence bearing on Giardini's credibility or possible bias would be highly relevant to all of the claims raised by Plaintiffs. As can be seen by a review of Alan Spitzer's deposition, nearly the entirety of the investigation and any decisions related to it were

run through Giardini.  Time and again during his deposition, Alan Spitzer deferred to Giardini or indicated that the information would only be known to Giardini.  Alan Spitzer candidly admits that "Mr. Giardini would be the person to answer [that line of questioning] because [Alan Spitzer] was relying on him to do the investigation and deal with the EEOC."  Doc. 128 at 71. At other times, Alan Spitzer responded: "I would have to ask Mr. Giardini that because he handled it, so I don't know."  Doc. 128 at 89; "Mr. Giardini would have to answer that."  Doc. 128 at 93; and "So you relied on Mr. Giardini for everything in this case?  A. **More or less, yes.**"  Doc. 128 at 93 (emphasis added).  Accordingly, the withholding of Giardini's notes clearly resulted in substantial prejudice to all the plaintiffs in this action.

### IV. Sanction

Based upon the above, there is no question that Defendants and their counsel engaged in sanctionable conduct.  The failure to produce material, relevant documents for **years** is inexcusable.  The fact that these documents were able to located in roughly 24 hours following the threat of Court sanction only serves to demonstrate how woefully inadequate Defendants' initial search for responsive documents was at the time of the requests.  By engaging in this conduct, Defendants and their counsel clearly violated the dictates of Rule 37 and fell well short of the obligations of the bar to the Court.  As a result of the conduct, Plaintiffs' counsel was deprived of the opportunity to engage in meaningful discovery depositions of Blackmur, Kim, and Giardini, **at a minimum.**  Further, Plaintiffs' counsel could not possibly properly prepare for trial without all this information – information that could clearly alter the entire landscape of these proceedings and the legal theories pursued during trial.

Due to Defendants' failures, the Court was left with no choice but to declare a mistrial in this matter.  No mechanism existed to undo the prejudice caused to Plaintiffs.  While Defendants

asserted that trial could simply be broken for additional discovery and witnesses could be recalled, it is impossible to conceive of how to inform a jury of these irregularities without undue prejudice to Plaintiffs. There is no doubt that such a break and the recalling of witnesses would *appear* to be some form of incompetence of Plaintiffs' counsel, when the truth would remain that the delay was the sole result of misconduct or negligence by Defendants and/or their counsel.

In candor, the Court has strongly considered default judgment in this matter. There is certainly a lingering question over how much evidence may never be produced due to either Defendants' negligence or malfeasance. However, the Court was also able to witness the testimony of numerous Plaintiffs during the trial in this matter, and default judgment may in fact be a windfall for some if it were granted in total. Instead, the Court finds that an award of attorney fees will serve as a proper sanction. In that manner, Plaintiffs' counsel will be made somewhat whole for all of the time that was essentially wasted in conducting discovery and trying this matter without all the facts that should have been made known to them.

The Court has carefully reviewed the fee and cost requests submitted by counsel. In that regard, the Court finds the fees to more-than-reasonable. For example, counsel for the EEOC seeks only fees for the ninety days leading up to and including trial. The EEOC does not seek fees for all of the discovery and depositions that were rendered largely meaningless by Defendants' misconduct. The Court also finds that the rate requested by the EEOC, $350 per hour, is reasonable for this market, and that the hours requested, 140 hours, are substantially lower than the Court anticipated for preparation and trial of this matter over a three-month period. Accordingly, the EEOC is awarded fees and costs in the amount of $49,000.

The Court has also reviewed the affidavits of Attorneys Bolek, Besser, Glesius, and Royer. Similar to the EEOC, Attorney Glesius seeks fees at a rate of $350 per hour and $250 per

16

hour for fees occurred in 2010. Once again, the Court finds these hourly rates to be well within the range of reasonable. Unlike the EEOC, Glesius seeks fees dating back to 2010. As detailed above, the misconduct in this matter dates back to at least 2008. Accordingly, the Court finds that the time frame of the fee request is reasonable. Finally, the Court finds that the total hours expended by Glesius over these years, roughly 330 hours, is also well within reason given the scope and duration of this litigation. Similarly, Glesius' one-time co-counsel, Attorney Christine Royer, seeks fees at a rate of $200 per hour for just under 110 hours. Likewise, the Court finds that the rate and the number of expended hours were reasonable. Accordingly, Plaintiff Nuriddin is awarded attorney fees in the amount of $115,395.

Attorney Matthew Besser seeks fees at $250 per hour for 115.9 hours working for Plaintiff Okafor. Similarly, Attorney Cathleen Bolek seeks fees at $350 per hour for 342.7 hours. Bolek also asserts that in total she has spent more than 570 hours on the matter and that the 342.7 hours were devoted to depositions, discovery disputes, trial preparation and trial. Once more, the Court finds that the number of hours expended and the hourly rate are reasonable for both Bolek and Besser. Accordingly, Plaintiff Okafor is awarded attorney fees in the amount of $148,920.

The Court intends that these fees will be levied against all defense counsel, including Attorney Giardini and Attorney Scully. Moreover, the award will be joint and several with each of the corporate Spitzer Defendants. As Giardini initially wore both hats, as management for Spitzer and its attorney of record, the Court cannot draw a firm line between the conduct of counsel and the parties. Moreover, it is clear from the record that even once he became solely a party representative, Giardini made no efforts to locate documents that were responsive to discovery, nor does it appear that his counsel made such efforts. The inability of counsel and the

17

Spitzer corporate entities to comply with their discovery obligations has effectively set this case back to its starting point.  As a result, trial proceedings and for that matter, motion practice was rendered largely meaningless.  Plaintiffs must now engage in new discovery, again with no guarantee that all documents have been produced, and the matter must again be tried.  Accordingly, the matter will be set for a status conference.  At that time, the Court will set the scope of future discovery.  The costs and fees associated with that discovery will also be borne entirely by the corporate Defendants and their counsel.

Finally, the Court will hold in abeyance any ruling on whether the pro hac vice status of Attorney Griffith should be revoked.

A status conference is hereby scheduled for **June 5, 2013 at 1:30 p.m.**.  **ALL COUNSEL AND PARTIES SHALL ATTEND.**  At that time, the parties should be prepared to discuss 1) any possible resolution of this matter, 2) the scope of any discovery before retrial, and 3) dates for a new final pretrial and trial.

IT IS SO ORDERED.

Date:   May 22, 2013  /s/ John R. Adams
Judge John R. Adams
UNITED STATES DISTRICT COURT